# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAUL TOMAS MATA,<br><br>Defendant. | 1:22-CR-10026-CBK<br><br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |

In this assault and firearm discharge case, Raul Tomas Mata (Mata) moves to suppress all statements he made in three interviews relating to a house shooting investigation. All three of them sidestepped *Miranda*. Mata though only made incriminating statements in the third one. Because those statements should be excluded as substantive – but not impeachment – evidence, Mata's suppression motion should be granted in part and denied in part.

## BACKGROUND

Just after 1:00 a.m. on April 29, 2022, 911 received reports of shots fired into a residence in Little Eagle, SD that struck a female child. Investigators reviewed surveillance footage and spoke with witnesses, leading them to believe it was a drive-by

shooting involving an Impala.  At about 2:20 a.m., Bureau of Indian Affairs Special Agent Dustin Dobbs (Dobbs) and another officer located and stopped an Impala matching the description and detained the two occupants for questioning.  Mata arrived at the scene of the traffic stop, within the hour, apparently to check on his friends who were in the car.  Officers immediately handcuffed him.

### A.  First Interview

A couple of hours afterward, Dobbs and Federal Bureau of Investigation Special Agent Joel Smith (Smith) interviewed Mata in Dobbs's vehicle.  Dobbs advised Mata of his *Miranda* rights.  Mata waived them, spoke to agents for about 20-minutes, then invoked his right to remain silent:

| | |
|---|---|
| Smith: | . . . . And how long are you there for? |
| Mata: | For a while.  I don't even know to be honest. |
| Smith: | Okay.  Best guess. |
| Mata: | Well, I don't know.  I kind of feel uncomfortable answering. |
| Smith: | Okay. |
| Mata: | I'd like to remain silent. |
| Smith: | Okay. |
| Dobbs: | I think I'm going to - - okay. |
| Smith: | That's - - that's your right.  Just on that question then, can we ask you about other questions? |
| Mata: | Uh just in general. |
| Smith: | Okay.  So you - - you want to be silent then. |

| Mata: | Yeah. |
|---|---|
| Smith: | Okay.  All right. |
| Dobbs: | Is that it? |
| Smith: | Yeah. |
| Dobbs: | Okay.  The time is 5:30 p.m. - - or 5:30 a.m.[1] |

**B. Second Interview**

Agents subsequently arrested Mata and transported him to the adult correctional facility in Fort Yates, North Dakota.  Dobbs secured a search warrant for Mata's DNA, and interviewed Mata a second time at about 6:25 p.m. that same day with Bureau of Indian Affairs Special Agent Sparky Edwards (Edwards) present.  After Dobbs read the *Miranda* warning, Mata invoked his right to remain silent, but agents pushed on:

| Dobbs: | So having those rights in mind, will you talk to us about this incident? |
|---|---|
| Mata: | Um I would just like to remain quiet, sir. |
| Edwards: | You want to stay quiet? I mean, is it okay if we talk to you about some things? |
| Mata: | Um what is it about?[2] |

Leveraging their mutual experience in military service, Edwards then pontificated about the need to locate the gun in hopes of engaging Mata:

---

[1] Mot. Hr'g. Ex. 1, Recording 1, at 21:10-21:54 (Nov. 2, 2022).

[2] Mot. Hr'g. Ex. 1, Recording 2, at 01:31-01:50.

| | |
|---|---|
| Edwards: | . . . . Are you at least willing to help us get that [gun] so we can put it away where nobody is going to get hurt? |
| Mata: | (unintelligible), sir. |
| Edwards: | What's that? |
| Mata: | Um I would just like to remain quiet, sir. |
| Edwards: | Okay. Okay. Like I said, we'll - - we'll respect whatever you want to do.  My - - again, just my hope was that you would know that you don't want that [gun] out there.  So if you - - if you change your mind and want - - want to do that before something bad happens, just tell us.  I can see it weighing on you. |
| Mata: | I'd just like to remain quiet, sir.[3] |

Edwards and Dobbs persisted for about four more minutes in an attempt to get Mata to cooperate and "help [him]self out."[4]  Edwards, in particular, talked about coming in to assist a fellow soldier and "brother of mine" and the benefits of cooperating ("especially from somebody in the Armed Forces.").[5]  While Dobbs collected the buccal swab, he and Edwards sought to keep the conversation going:

| | |
|---|---|
| Edwards: | . . . . Like I said, you got to know a staff sergeant cares about their Joes.  So again, I do, but I can only help you if you want to help yourself. |
| Mata: | Yes, sir. |
| Edwards: | Okay. |

---

[3] *Id.* at 03:18-03:56.

[4] *Id.* at 03:57-08:01.

[5] *Id.* at 05:11-06:44.

| | |
|---|---|
| Dobbs: | Do you have any questions for us? |
| Mata: | Um when - - |
| Edwards: | You can ask anything. |
| Mata: | When um court I guess. |
| Dobbs: | On Monday. |
| Mata: | Monday? |
| Edwards: | Yeah. . . . I got to ask before I - - before we end all this, because I've got to make sure that I did what I could when I leave here - - because I've got to go home and sleep too - - is that gun going to get in a kid's hands? Is it possible? Just tell me at least that. I mean, if it's somewhere safe that you know it's not going to, then so be it, but is a kid going to get ahold of it? |
| Mata: | I would just like to remain quiet, sir. |
| Edwards: | Okay.[6] |

## C. Third Interview

About two days later, on May 1, 2022, Dobbs interviewed Mata a third time. In this interview, Dobbs prefaced the *Miranda* warning with nine minutes worth of investigation details and references to an incident involving Braxton Little Dog. Dobbs also alluded to Mata's family possibly being in danger:

| | |
|---|---|
| Dobbs: | . . . . Um but again, since you're in custody, before I ask you any questions, I have to advise you of your rights just because you're not free to leave. |
| Mata: | Right. |

---

[6] *Id.* at 08:02-09:11.

| | |
|---|---|
| Dobbs: | You're in custody. Okay? |
| Mata: | Right. |
| Dobbs: | So I'm going to go over those with you right now.  Again, read them just like I've been doing.  Um. |
| Mata: | Is my family okay though? |
| Dobbs: | Right now, yes.  Right now they are. . . .[7] |

From there, Dobbs mentioned talking to Mata's uncle about retaliation and trying

to smooth things over with the family before giving the *Miranda* advisement:

| | |
|---|---|
| Dobbs: | . . . . Having those rights in mind, will you talk with me about, you know - - if there's anything you don't want to answer, you can just tell me, "Hey, Dobbs, I don't want to answer that." |
| Mata: | Okay. |
| Dobbs: | But I want to - - I want to go back to some of the other stuff. |
| Mata: | Okay. |
| Dobbs: | Okay? Are you okay answering questions about that? |
| Mata: | Um a few things I'm okay, but it's just, like, Braxton's playing with my life right now. |
| Dobbs: | Okay. |
| Mata: | Like - - |
| Dobbs: | Um and we can get into that.  Okay? But, first, I - - I want to make sure that you understand that - - you understand the rights I just read to you. |
| Mata: | Okay. |

---

[7] Mot. Hr'g. Ex. 1, Recording 3, at 08:20-08:49.

| | |
|---|---|
| Dobbs: | Do you understand those? |
| Mata: | Yeah. |
| Dobbs: | Okay.  And I'll talk to - - with you about the Braxton stuff. |
| Mata: | Okay. |
| Dobbs: | Um for sure.  Do you - - will you speak with me about this? |
| Mata: | Um I respect you, but I just want to remain quiet. |
| Dobbs: | You want to remain quiet? Okay. |
| Mata: | Yes, sir. |
| Dobbs: | Can I ask you question - - or you don't have to answer me - - |
| Mata: | Yes, sir. |
| Dobbs: | - - answer every question that I ask. |
| Mata: | Yes, sir. |
| Dobbs: | Um but can I ask you just a couple - - or some questions?  And, you know, if you feel that you want to answer them, answer them.  If you don't say, "Hey, Dobbs, I don't want to answer them." |
| Mata: | Yes, sir. |
| Dobbs: | Is that okay with you? |
| Mata: | I'm okay with that.[8] |

The interview proceeded for 35 more minutes and focused primarily on Little Dog.

Eventually, Dobbs asked where the gun was:

| | |
|---|---|
| Dobbs: | . . . Will you tell me where it's at? |

---

[8] *Id.* at 10:06-11:24.

Mata:                   Um with that I would just like to remain quiet on that one, sir.

Dobbs:                Okay. Um let me see where else I can go. . . .[9]

After this point, Dobbs described the sweeping nature of a criminal conspiracy and how it puts others at risk and, while doing so, circled back to the peril Mata and his family faced.[10]  Although Dobbs paused his questioning, he returned to it with another gun query:

Dobbs:                . . . . But, again, the only thing I can keep going back to is that firearm because that is going to be what the higher powers are going to want.  Okay?  So I'm going to ask again: You know, can you please tell me where that gun is?

Mata:                   Mm I would just like to remain quiet because I feel like - - -

Dobbs:                What do you feel like?

Mata:                   Being accused.

Dobbs:                Okay.

Mata:                   I would just like to remain quiet now.

Dobbs:                Okay.  Yeah.  I don't have any other questions, man.  Do you have any questions for me?

Mata:                   No, sir.

Dobbs:                No?  Okay.  Um yeah, I think that's - - that's about it.  Do you have - - do you have a girlfriend or anything?[11]

---

[9] *Id.* at 45:28-46:00.

[10] *Id.* at 46:00-56:09.

[11] *Id.* at 56:10-57:31.

Then, Dobbs wended ahead and asked a bunch more questions, obtaining further information from Mata, before finally ending the interview:

| | |
|---|---|
| Dobbs: | . . . . Well, anything else? |
| Mata: | No, sir. |
| Dobbs: | No? Anything I didn't ask that you think I should know before we stop? Anything. |
| Mata: | No, sir. |
| Dobbs: | No? Okay. We can conclude the interview. [12] |

A federal grand jury ultimately indicted Mata and charged him with assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, and discharge of a firearm during a crime of violence.[13]  Mata thereafter moved to suppress the statements he made during the three interviews and the Court held an evidentiary hearing on the motion.  During the hearing, Mata conceded that only the third interview contained incriminating statements and that it alone was the one subject to suppression.[14]  The government resisted the motion.[15]  The Court then took the matter under advisement.[16]

---

[12] *Id.* at 59:14-59:37.

[13] Docket No. 1.

[14] Docket No. 33 at 82.

[15] Docket No. 23.

[16] Docket No. 33 at 82.

## DISCUSSION

### A. Invocation

Mata first claims that the statements he made to Dobbs should be suppressed because he invoked his Fifth Amendment right to remain silent. The recording of the third interview shows that after being Mirandized, Mata said he wanted to "remain quiet." Mata argues that these utterances were sufficient as a matter of law to trigger his right to silence and cut off any questioning of him.

*Miranda* requires that law enforcement officers provide certain warnings before they conduct an interrogation of a suspect in custody, and police may not proceed with questioning if the suspect indicates a desire to remain silent.[17] In the context of invoking the *Miranda* right to counsel, the Supreme Court has held that a suspect must do so "unambiguously."[18] If the suspect says something about this right "that is ambiguous or equivocal" then police need not end the interrogation, nor must they clarify whether the suspect wants to invoke his *Miranda* rights.[19]

The same standards apply for determining when a suspect invokes his *Miranda* right to remain silent.[20] These standards, the Supreme Court has declared, "protect the

---

[17] *See Miranda v. Arizona*, 384 U.S. 430, 473-74, 78-79 (1966).

[18] *Davis v. United States*, 512 U.S. 452, 459 (1994).

[19] *Id*. at 459, 461-62.

[20] *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see also Solem v. Stumes*, 465 U.S. 638, 648

privilege against compulsory self-incrimination,[21] by requiring an interrogation to cease when either right is invoked."[22]  The suspect may selectively invoke his right to remain silent, confining it to certain questions or subject matters without requiring that the interview cease.[23]  If the suspect selectively invokes his right to remain silent, then officers must not continue asking questions about the subject matter the suspect wants to avoid.[24]

---

(1984) ("[M]uch of the logic and language of [*Michigan v. Mosley*, 423 U.S. 96 (1975)]" which discuss the *Miranda* right to remain silent "could be applied to the invocation of the [*Miranda* right to counsel].").

[21] *See Miranda*, 384 U.S. at 467-73.

[22] *Berghuis*, 560 U.S. at 381; *see Mosley*, 423 U.S. at 103-04; *Fare v. Michael C.*, 442 U.S. 707, 719 (1979).

[23] *See United States v. Reynolds*, 743 F. Supp. 2d 1087, 1090 (D.S.D. 2010) (citing *Fare*, 442 U.S. at 727; *United States v. Eaton*, 890 F.2d 511, 513 (1st Cir. 1989)); *see also Hurd v. Terhune*, 619 F.3d 1080, 1088 (9th Cir. 2010) (finding that defendant's refusal to respond to certain officer questions does not require interrogation to cease, and that defendant's silence or refusal to answer is inadmissible (citing *Doyle v. Ohio*, 426 U.S. 610, 618-19; *Berghuis*, 560 U.S. at 381)).

[24] *See Michaels v. Davis*, 51 F.4th 904, 924 (9th Cir. 2022) ("In the context of selective invocation of the *Miranda* right to silence, the cessation requirement means that police officers cannot continue to ask about the same subject the suspect said he did not want to talk about."); *see also* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure* § 6.9(g) (4th ed. 2021) ("But if the defendant 'clearly and unequivocally invoked his *Miranda* rights selectively,' that is a sufficient invocation of *Miranda* with respect to the specific situation covered by the invocation." (quoting *Arnold v. Runnels*, 421 F.3d 859 (9th Cir. 2005)).

That said, a suspect who wants to invoke his right to remain silent must "do so unambiguously"[25] with a "clear, consistent expression of a desire to remain silent."[26]  The suspect need not speak any magic words.[27]  An unambiguous invocation of the suspect's "right to cut off questioning" must be "scrupulously honored."[28]  But an "[i]ndirect, ambiguous, or equivocal statement[] or assertion[] of an intent to exercise the right to remain silent [is] not enough to invoke that right . . . ."[29] and a reasonable officer may

---

[25] *Berghuis*, 560 U.S. at 381; *see also United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) ("A suspect invokes his right to remain silent by making 'a clear, consistent expression of the desire to remain silent.'  Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right are not enough to invoke it for purposes of *Miranda*."); *Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) ("Being evasive and reluctant to talk is different from invoking one's right to remain silent.").

[26] *Ferrer-Montoya*, 483 F.3d at 569 (8th Cir. 2007) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)).

[27] *See Miranda* 384 U.S. at 445 ("if the individual . . . indicates *in any manner* that he does not wish to be interrogated, the police may not question him." (emphasis added)); *Anderson v. Terhune*, 516 F.3d 781, 788 (9th Cir. 2008) (en banc) ("the Supreme Court . . . [has not] required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.'" (citation omitted)); *United States v. Wolfe*, No. 8:17-CR-154, 2017 WL 5989216 (D. Neb. Nov. 14, 2017), *R&R adopted sub nom. United States v. Merrick*, No. 8:17-CR-154, 2017 WL 5990131 (D. Neb. Dec. 1, 2017) ("[d]efendant's assertion that 'Okay, I just want to quit now,' was a clear, unequivocal, and unambiguous request to invoke her right to remain silent and to end the interrogation."); *but see United States v. Adams*, 820 F.3d 317, 323-24 (8th Cir. 2016) (holding that, in its context, defendant saying, "Nah, I don't want to talk, man," was not unambiguous assertion of right to remain silent).

[28] *Mosley*, 423 U.S. at 103 (citation omitted).

[29] *Ferrer-Montoya*, 483 F.3d at 569 (citing *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995).

properly attempt to clarify an ambiguous invocation.[30]    Whether a suspect

unambiguously invoked the right is a factual determination for the court,[31] assessing the

suspect's statements as an objective, reasonable person would understand them within

the context of the interview.[32]

In the third interview (the only one subject to suppression) Mata stated he wanted

to "remain quiet" at least five separate times in response to Dobbs's questioning.[33]  But

for each of Mata's invocations, Dobbs testified that he thought "quiet" was "ambiguous,

meaning it's open to interpretation," and, "in this case, quiet wasn't specified what [Mata]

wanted to be quiet on."[34]  An objective officer would understand that "I would just like

to remain quiet" means virtually the same thing as "I would like to remain silent."[35]

---

[30] *See Davis*, 512 U.S. at 461 (in right to counsel context, "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney").

[31] *Ferrer-Montoya*, 483 F.3d at 569 (citing *United States v. Cody*, 114 F.3d 772, 775 (8th Cir. 1997)).

[32] *See Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001) ("To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are considered as a whole."); *Smith v. Boughton*, 43 F.4th 702, 710-11 (7th Cir. 2022) (analyzing defendant's statements in response to question posed).

[33] Mot. Hr'g Ex. 1, Recording 3 at 10:55-11:06, 45:28-45:39, 56:35-56:48, 57:05-57:11.

[34] Docket No. 33 at 71.

[35] *See id.* at 70 (when asked, Dobbs himself admits that quiet is a synonym for silent and that the two can be interpreted the same).

In tandem with his refusal to accept Mata's words for their plain and recognizable meaning, Dobbs insisted he thought Mata only wanted to be silent on specific questions and did not mean to end the entire interview.[36]  But Dobbs asked the questions anyway. To Dobbs's credit, an objective person would agree that Mata's first two invocations were selective, and only his later response was meant to cut off all questioning.  Even so, given Dobbs's unceasing questions, the result of Mata's invocations – selective and general – require that the entire third interview be suppressed.

### 1.  Braxton

After reading the *Miranda* warning, Dobbs indirectly (or incompletely) asked Mata if he would waive his rights generally and then jumped right to whether Mata would speak with Dobbs about the "Braxton stuff."[37]  Mata responded that he did *not* want to discuss that subject, and confirmed as much when Dobbs asked, "You want to remain quiet? Okay." "Yes, sir," Mata said.[38]  Although selective, this clear invocation Dobbs ignored too, as he gingerly queried, "Can I ask you question - - or you don't have to answer me . . . answer every question that I ask."[39]  From there the interview continued

---

[36] *Id.* at 35-36, 39- 40, 57, 62, 71, 73-74.

[37] Mot. Hr'g Ex. 1, Recording 3, at 10:45-10:50.

[38] *Id.* at 10:06-11:24.

[39] *Id.*

another 30-minutes, exclusively about Mata's history with Little Dog.[40]  Because Mata unambiguously, though selectively, invoked his right to remain silent about the Little Dog subject matter, and Dobbs failed to "scrupulously honor" the right and carried on with questions about that matter, the portion relating to it (which was most of the interview)[41] should be suppressed.

### 2. Gun

At about 45- minutes into the interview, Dobbs asked Mata where the gun was. Mata replied, "Um with that I would just like to remain quiet on that one, sir."[42]  By doing so, Mata selectively invoked his right to remain silent – and once again, Dobbs ignored it.  Dobbs followed Mata's eschewing with a 10-minute harangue, then returned to the gun: "So I'm going to ask again: You know, can you please tell me where that gun is?"[43] Since Mata had already selectively invoked on the gun issue, any further questions germane to it violated Mata's right to silence.  That segment of the interview, concerning the gun and its whereabouts,[44] should therefore be suppressed as well.

---

[40] *Id.* at 11:25-42:27.

[41] *Id.* at 11:03-45:28.

[42] *Id.* at 45:28-46:00.

[43] *Id.* at 56:27-56:35.

[44] *Id.* at 45:29-57:11.

### 3. General Invocation

After Dobbs pressed Mata the second time to reveal where the gun was, Mata exercised his silence right once more: "Mm I would just like to remain quiet because I feel like - - -." Before Mata could finish, Dobbs interjected: "What do you feel like?" Mata repeated, "Being accused," to which Dobbs answered "Okay."[45] Mata then reiterated that "I would just like to remain quiet now."[46]  His invocation covered the rest of the interview and *all* questioning after that point should have ceased.  Dobbs though dismissed Mata's request and general invocation and peppered Mata  with questions about his girlfriend, "baby mama," and more.[47]   None of Dobbs's questions were permissible and the statements Mata made, after generally invoking his right to remain silent,[48] should be suppressed.

### B. Impeachment

Having determined that the government may not use Mata's statements before resting its case against him, the Court must decide whether the statements are admissible for impeachment purposes.

---

[45] *Id*. at 56:36-57:06.

[46] *Id*. at 57:07-57:31.

[47] *See id*. at 57:17-59:26.

[48] *Id*. at 57:12-59:37.

Although statements taken in violation of the prophylactic *Miranda* rules cannot be used as substantive evidence, they may still be admissible to impeach the conflicting testimony of a defendant.[49]  The prosecution cannot convict a defendant based on evidence acquired in disregard of constitutional guarantees and their judicially created protections.  But the use of statements so gained to impeach prior inconsistent testimony is a different story.  If the defendant chooses to testify on his own behalf, then he assumes a reciprocal "obligation to speak truthfully and accurately,"[50] and may not "turn the illegal method by which evidence in the government's possession was obtained to his own advantage and provide himself with a shield against contradiction of his untruths."[51]  It is only when the defendant's statements are involuntary that they must be excluded for all purposes.[52]

---

[49] *See Oregon v. Hass*, 420 U.S. 714, 722-23 (1975); *Harris v. New York*, 401 U.S. 222, 224-26 (1971).

[50] *Harris*, 401 U.S. at 225.

[51]*Id.* at 224 (*quoting Walder v. United States*, 347 U.S. 62, 65 (1954)); *see also Hass*, 420 U.S. at 723 (applying same rationale where suspect advised of his rights and then asked for counsel but questioned without request being honored); *see also Oregon v. Elstad*, 470 U.S. 298, 307, 309 (1985) ("Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination . . . . If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.").

[52]*See New Jersey v. Portash*, 440 U.S. 450, 459 (1979); *Mincey v. Arizona*, 437 U.S. 385, 389 (1978).

When statements to law enforcement are "the product of an essentially free and unconstrained choice by their maker," they are voluntary.[53] Statements are not considered involuntary unless the police extorted them from the accused through coercive activity.[54] Coercive police activity is a necessary predicate to finding that statements are involuntary under the Due Process Clause.[55] Voluntariness is judged by the totality of the circumstances.[56]

Although Dobbs failed to respect Mata's right to remain silent, nothing reveals that Mata's will was overborne. Mata had a high school diploma, was respectful, appeared to understand what agents said, and appropriately communicated with them.[57]

---

[53] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[54] *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (cleaned up).

[55] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

[56] *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (en banc); *United States v. Daniels*, 775 F.3d 1001, 1004-05 (8th Cir. 2014) ("We consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.").

[57] *See* Docket Nos. 12 (reflecting Mata a high school graduate) and 33 at 8 (Mata had military training and was "very cognitive," "very alert," "respectful," and "very well suited to talk"), 23 (he was "respectful" and maintained a "respectful tone"), 34 ("he understood fully what I said to him, questions, and our conversations . . . seemed to me like a normal conversation. . . . Mata appeared very well put together."); Mot. Hr'g Ex. 1, Recording 3 (he often responded with "Yes, sir," or "No, sir.").

He maintained a calm, collected demeanor throughout the interview,[58] and demonstrated his free will when he expressed a desire to selectively speak on certain topics. When Mata did answer questions, he was often cagey with his responses, further showing his aptitude. And when Dobbs leaned on him, Mata repeatedly asserted that he would like to "remain quiet."

The interview took place in the same room as the second one and lasted less than an hour.[59] And at no time while the two were together that afternoon did Dobbs yell, brandish a weapon, use force, employ punishment, or otherwise coerce Mata.[60]

True, Dobbs made reference, during the interview, to threats to Mata's family possibly coming from other individuals associated with the shooting incident. But law enforcement was not the source of the threats, if they even existed at all, and Dobbs said he was working to resolve them.[61, 62]

---

[58] *See* Docket No. 33 at 34 ("Mata seemed receptive to . . . our conversation" and "[h]e spoke cordial[ly] to me.").

[59] Docket No. 33 at 32-33, 35, 57.

[60] Mot. Hr'g Ex. 1, Recording 3; Docket No. 33 at 32-34.

[61] *See* Mot. Hr'g Ex. 1, Recording 3, at 2:05-3:23.

[62] *See, e.g.*, *United States v. Astello*, 241 F.3d 965, 967-68 (8th Cir. 2001) (finding that although threats raised by law enforcement to elicit confession may affect voluntariness of suspect's statements, officers suggesting potential "disgrace" to suspect's family if he did not confess did not by itself make suspect's statements involuntary).

Dobbs managed to get Mata to talk after the invocations. Mata's choice to speak (contrary to his expressed desire not to) seems, however, to be a product of his own indecision or curiosity about what Dobbs would ask him. The interview recording establishes that, notwithstanding his repeated "I would just like to remain quiet," Mata still comprehended his predicament. When Mata spoke, he did so voluntarily; when he refrained, he did it with a resolved willpower. Dobbs's tactics – while contrary to *Miranda* – did not undermine Mata's free-will and decision-making abilities. Mata's amenability to selectively invoke his right to silence dwindles any possibility of an overborne will. His statements were voluntarily made and should be admissible as impeachment evidence.

## CONCLUSION

When prefaced by the April 29 interviews, (the second one being particularly egregious in snubbing *Miranda*, yet yielding no incriminatory fruits), Dobbs made little effort to "scrupulously" respect Mata's right to remain silent when the two met again on May 1. And even though Mata did not veritably speak the coined words of *Miranda* during the meeting, he clearly, unambiguously, and repeatedly invoked his Fifth Amendment right to remain silent and any objectively reasonable officer would have known that. Dobb's dissolute manner of questioning, through repeated attempts to elicit incriminating statements after Mata expressed his desire to remain silent, was out of line with *Miranda* and should be rebuked. But the totality of the circumstances show Mata

20

made his statements voluntarily.  So the government should be allowed to use the statements for impeachment purposes if Mata gives contrary testimony at trial.

## RECOMMENDATION

Based on the authorities and legal analysis set forth in this report, and the record before the Court, it is

RECOMMENDED that Mata's Motion to Suppress Evidence[63] be granted in part and denied in part.  The Motion should be granted to the extent that it seeks to exclude Mata's May 1, 2022 statements as substantive evidence; but denied insofar as the Motion seeks to suppress the statements as impeachment when and if he takes the stand and contradicts what he earlier said.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[64] Unless an extension of time for cause is later obtained,[65] failure to

---

[63] *See* Docket No. 21.

[64] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[65] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

file timely objections will result in the waiver of the right to appeal questions of fact.[66]

Objections must "identify[] those issues on which further review is desired[.]"[67]

DATED this 29th day of November, 2022.

BY THE COURT:

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[66] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[67] *Arn*, 474 U.S. at 155.